(Reap. Dec. 10927)

FULLER TOOL CO., INC. (REGENT SHEFFIELD) ET AL. *v.* UNITED STATES

Entry No. 959192, etc.

(Decided March 23, 1965)

*Siegel, Mandell & Davidson* (*Joshua M. Davidson* and *Allan H. Kamnitz* of counsel) for the plaintiffs.

*John W. Douglas,* Assistant Attorney General (*Richard J. Kaplan* and *Arthur H. Steinberg,* trial attorneys), for the defendant.

LAWRENCE, Judge: The appeals for a reappraisement enumerated in the schedule attached to and made a part of this decision were consolidated for purposes of hearing and determination. Presented for the court's consideration is the proper value for dutiable purposes of six styles of pliers, manufactured by Elliott-Lucas, Ltd., of England

and exported to the United States during the period from January 1957 to and partly including February 1958 and, having been entered for consumption prior to February 27, 1958, were subjected to appraisement pursuant to the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U.S.C. § 1402) rather than by the amendments contained in the Customs Simplification Act of 1956, 70 Stat. 943.

Pursuant to section 402a(e) of the basic tariff act, as amended by the Customs Administrative Act of 1938 (19 U.S.C. § 1402(e)), the merchandise was appraised on the basis of the United States value of such merchandise on a secondary level, to wit, sales of said pliers in the United States by plaintiffs' jobbers to the retail dealers of such merchandise. Plaintiffs do not dispute the fact that a United States value may be predicated on a secondary level of offers of sales of merchandise, inasmuch as that matter has been adjudicated in the case of *Samuel Shapiro & Company, Inc., a/c The Sharpe & Hart Associates, Inc.* v. *United States*, 51 CCPA 89, C.A.D. 842. However, it is their position that such a value does not exist for the instant merchandise and they contend that the pliers in controversy should have been appraised on the basis of cost of production, as that value is defined in section 402a(f) of the Tariff Act of 1930 (19 U.S.C. § 1402(f)).

It is plaintiffs' position that, since appraisement has been made on the basis of United States value at a secondary level, there is no foreign or export value for such or similar merchandise and that there is no United States value for such or similar merchandise at the primary level of sales within the purview of section 402a (c), (d), and (e) of said tariff act, as amended by the Customs Administrative Act of 1938.

It is plaintiffs' further position that there were no sales or offers for sale of the instant merchandise within the requirements set forth for United States value in said section 402a(e), as amended, *supra*, and, therefore, there is no United States value for such or similar merchandise at the secondary level of sales.

Plaintiffs' contention is that the proper basis of appraisement is cost of production, as that value is defined in section 402a(f) of the Tariff Act of 1930.

By stipulation of the parties hereto, it has been agreed that if the court finds there is no United States value for the merchandise within the provisions of section 402a(e) of the Tariff Act of 1930, as amended, the proper basis of appraisement is represented by cost of production in section 402a(f) of said act, and that said cost of production is represented by the invoiced values, plus 6½ per centum, net, packed. It

was also agreed by the parties hereto that if the court should find there is a United States value for the merchandise in issue then said United States value, as defined in section 402a(e), is represented by the value found by the appraiser.

The statutory provision for United States value is here set forth. Section 402a(e):

UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale, for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

The first witness who testified for the plaintiffs was John Williams Weil, vice president and sales manager of the Fuller Tool Co., Inc., the actual importer herein. He has been associated with this company for 13 years and, in his present capacity, is in charge of all sales. He is familiar with the pliers in issue and the trade conditions under which Fuller Tool Co., Inc., sells the Elliott-Lucas pliers in the United States. He has traveled throughout the United States in connection with the sale of such pliers.

On being shown samples of two pliers, one a long-nose, side-cutting pliers and the other a diagonal-cutting pliers, he stated that they are representative of the merchandise sold by Fuller Tool Co., Inc., in the United States. He explained that such pliers are imported in bulk. They are removed from the bulk packaging and examined. If rusted, the pliers are stripped of the lacquer and rebuffed and relacquered; if the pliers are tight, they are either loosened or discarded. The pliers are then packaged on cards, as indicated by plaintiffs' illustrative exhibit 1, which was received in evidence. Weil explained that whereas exhibit 1 shows the pliers affixed to the card by plastic bubbles at the time the instant pliers were imported during 1957 and early 1958, the means of affixing pliers to the cards were by rubber bands. The printed matter appearing thereon is identical.

Witness Weil testified that the pliers represented by exhibit 1 are the same as those imported at the time of the instant merchandise and represent two of the six item numbers of pliers his company imports. There is no material difference among the six item numbers, except in style and size. The carding is the same, as is the legend on the card and the price at which they are offered.

Weil stated that the Fuller Tool Co., Inc., does not offer Elliott-Lucas pliers as represented by exhibit 1 for sale in the United States to all purchasers. These pliers are offered to recognized hardware jobbers called franchised wholesalers who must sell to their dealers. Fuller Tool Co., Inc., sold only to its franchised wholesalers and the franchised wholesalers were instructed to sell at a specified price to their hardware dealers and in specified trade areas. One of the conditions under which Fuller Tool Co., Inc., sold to wholesalers was that the latter, in turn, would sell only to retail hardware stores and lumber yards. As plaintiffs' exhibit 2, there was received in evidence a Fuller Tool Co., Inc., catalog page, indicating the price at which the merchandise is to be sold by the jobbers to their customers and stating some of the conditions of sale. Upon being referred to the price of $1.98 shown on the cards illustrated in exhibit 2, the witness explained that is the retail selling price to be charged the ultimate consumers, under penalty of having the line withdrawn by the hardware dealers.

In 1957 and 1958, the price at which Fuller Tool Co., Inc., sold to its specially selected franchised jobbers was at the retail list price of $1.98, less 40 per centum and 10 per centum, plus a 2 per centum 10 days cash discount. At said time, the Fuller Tool Co., Inc., instituted and required that the specially selected retailers sell at the pre-printed price on the card of $1.98 and enforced this requirement by withdrawing the line from a jobber, if the requirement was breached. As plaintiffs' exhibit 3, there was received in evidence a photostatic copy of a form letter written by the Fuller Tool Co., Inc., to its franchised wholesalers telling the story of the Fuller pliers and giving the retail list price of the plier assortment and the cost of said assortment to the retailer and to the wholesaler. The purpose of his exhibit was to confirm the testimony given concerning market conditions.

As plaintiffs' exhibit 4, there was received in evidence a brochure representing the Fuller franchise plan. And as plaintiffs' exhibit 5, there was received in evidence a plaque known as a franchise plaque which was given by the Fuller company to its customers who agreed to participate in Fuller's program and to maintain prices 100 percent.

Based on his experience and knowledge, Weil testified that the conditions of sale for such merchandise as previously described represent the ordinary course of trade with relation to the Fuller Tool Co., Inc.'s products.

Weil also stated, based on his experience in the trade, that no pliers similar to the Elliott-Lucas pliers were sold in the United States in 1957 and 1958. In explanation of that statement, Weil explained that the imported pliers are made to specifications and are branded "Fuller." He explained that the Fuller pliers are superior as to finish,

in that they are both ground and polished and the cutting edges of the pliers are electronically hardened to make the cutting edges extra hard. Pliers such as those in issue are dissimilar from any other pliers sold in the United States. As to competitive pliers on the market, Weil testified there were some just as good but at a much higher price and were not commercially interchangeable with pliers such as those at bar.

It was Weil's testimony that the reason the Fuller Tool Co., Inc., restricted its jobbers to a particular retail price was in order to maintain prices. If one of the retailers were selling at other than the required price, a complaint would come from another retailer and the wholesaler would complain to the Fuller company. In addition, the Fuller company, through its salesmen who went around the country, spot checked to see that the retail price was maintained.

Ralph Silberman was called to testify as plaintiffs' second witness. He identified himself as vice president and general manager of Sickels-Loder, Inc., wholesale hardware distributor, with which company he has been associated for 16 years. He is familiar with the Elliott-Lucas pliers sold to his company by the Fuller Tool Co., Inc., and is familiar with trade conditions under which the Fuller company sells its products. He stated his company is a Fuller franchised distributor and that his company is listed on the Fuller honor roll. His company purchased the line of pliers for distribution in its given area, namely, the New York metropolitan area, restricted its sales to hardware dealers and lumber yards, and insisted that said retailers adhere to the suggested retail selling price. To the best of his knowledge, the retailers conformed to said requirements and he stated that the penalty for not doing so would be that the line would be withdrawn. Based upon his experience and knowledge, the conditions of sale previously described by him for the purchase and sale of the Fuller line represented the ordinary course of trade for such products.

To the best of his knowledge, the witness stated that merchandise similar to the Elliott-Lucas pliers is not offered for sale or sold in the United States at any level. Silberman testified to the fact that, in 1957 and 1958, there were no other pliers of the quality and price which would be commercially interchangeable with the pliers represented by collective exhibit 1.

As exhibit A, there was received in evidence on behalf of the defendant a report of Customs Agent Gerald C. Lundy, dated February 26, 1958, concerning pliers manufactured by Elliott-Lucas, Ltd., London, England, and imported by the Fuller Tool Co., Inc., of New York, N.Y.

Lundy's report was based on an interview with Edward J. Reinthal, manager of the Fuller Tool Co., Inc., and on reference to the firm's

records. Contained in said report, under the caption "Prices and Terms," appears the following:

The retail list price as suggested by the importer for all sizes of the pliers in question is $1.98 each. From the suggested retail list price the jobber is given a 50% and 10% discount plus 2% cash, 10 days. The jobber sells to the retailer at the retail list price of $1.98 each less 40%. It might be stated, however, that neither the importer or the jobber controls the suggested retail selling price. * * *

As defendant's witness, Milton Block, a customs examiner at the port of New York, assigned to the examination of all imported hand-tools at said port, upon being called to testify, stated that he had examined the merchandise at issue in conjunction with its appraisement. Block stated that when he received the report from Customs Agent Lundy (exhibit A), he felt it incumbent upon him to find out further from the principals if there were any restrictions placed upon the people to whom they sold. About the time of the receipt of the customs agent's report, he arranged a conference with Mr. Fuller of the Fuller Tool Co., Inc., at which there was also present Mr. Edward Reinthal, another representative of the Fuller company. Block stated that, in answer to his questions, he was informed that upon sale of the merchandise to its jobbers there was no further control insofar as disposition, resale price, or any territorial restriction. According to Block, the retail price of $1.98 was discussed, and it was his statement that—

I think we came to an understanding that $1.98 was a suggested retail price which was a sales promotional feature in that it gave a target for the retail store to shoot for. In reply to questions of mine, at that time nobody would state whether the prices were adhered to or not. When I say I mean the two principals of the firm.

Block also stated he was not informed of any enforcement device the Fuller company employed to maintain its prices, and he was satisfied that the market in the instant pliers was not a restricted market.

Plaintiffs herein called as a rebuttal witness for the plaintiff Bernard H. Fuller who, since 1936, has been president of the Fuller Tool Co., Inc. He testified to his familiarity with the occasion of his conversation with Customs Examiner Block and remembered referring to the sales conditions which prevailed in 1957. He stated he gave Block a complete account of his company's method of distribution and Fuller's statements were identical to the testimony previously given by plaintiffs' witness Weil in the instant proceeding.

Confronted as it is here with conflicting testimony of highly credible witnesses and after due deliberation of all the evidence presented, the court is of the opinion that the weight of evidence preponderates in favor of the plaintiffs herein and that said plaintiffs have overcome the presumption of correctness attaching to the appraiser's

decision and have sustained their burden of proof (28 U.S.C. § 2633).

In the opinion of the court, it is established by the evidence of record herein that no merchandise such as the pliers in issue was freely offered for sale to all purchasers, since the sale of such pliers is restricted by the importers to specially selected franchised jobbers who commit themselves to selling the pliers at a specified price to hardware dealers and lumber yards in specified trade areas. In turn, the sales and offers for sale by the hardware dealers and lumber yards are also restricted, in that, at the cost of having the line withdrawn, they are required to offer and sell pliers such as those in issue to the consumers at the specified retail list price.

It is also established by the record herein that the imported pliers are made to specifications and are branded "Fuller"; that they are superior as to finish; that the cutting edges are electronically hardened, which was an innovation at that time; that there are no similar pliers sold in the United States; and that there are no pliers in the United States market which would be commercially interchangeable with those in controversy. And, as stated by our appellate court in *C. J. Tower & Sons* v. *United States*, 50 CCPA 76, C.A.D. 824, "the overriding consideration in determining similarity, be it merely similarity of materials or overall similarity of merchandise for appraisement purposes, is *commercial interchangeability* rather than considerations of ultimate use or cost of production." [Italics quoted.]

After due deliberation and for the foregoing reasons on the record before me, I find as facts:

1. The merchandise covered by the instant appeals consists of six styles of pliers, manufactured by the Elliott-Lucas company of England and exported to the United States during the period from January 1957 to and partly including February 1958.

2. At the time of exportation, such or similar merchandise was not freely offered for sale to all purchasers for home consumption in England or for exportation to the United States.

3. At said time of exportation, such merchandise was not freely offered for sale in the principal market of the United States at either a primary or secondary level, and that there was no similar merchandise freely offered for sale in the United States.

4. That the cost of production of the pliers in controversy is the invoice unit value, plus 6½ per centum, net, packed.

As matters of law, I conclude:

1. That cost of production, as that value is defined in section 402a (f) of the Tariff Act of 1930, is the proper basis for determining the value of the merchandise in issue.

2. That such cost of production is the invoice unit value, plus 6½ per centum, net, packed.

Judgment will be entered accordingly.